343 F.3d 140
 Rodolfo Ullonoa FLORES, Luisa Torres Cheequiezol, on behalf of Veronica Velazco Torres, Maxima Quispe Canargo, on behalf of William Angelo Caronado, Elena Casilla, on behalf of Henry Anderson Casilla; David Bacangel Aguilar; Juana Jaillita Manani; Able Valdivia Acevedo and Mario Herrera, for the Estate of Mario Vitaliano Herrera Salinas, Plaintiffs-Appellants,
v.
SOUTHERN PERU COPPER CORPORATION, Defendant-Appellee.
 Docket No. 02-9008.
 United States Court of Appeals, Second Circuit.
 Argued: April 15, 2003.
 Decided: August 29, 2003.
 Filed: September 2, 2003.
 Filed: September 19, 2003.
 
 COPYRIGHT MATERIAL OMITTED WALLACE A. SHOWMAN, Taub & Showman LLP, New York, N.Y. (Malcolm S. Taub, Taub & Showman, New York, NY, Andrew C. Shirrmeister III and Dana S. Speer, Houston, TX, on the brief), for Plaintiffs-Appellants.
 PETER J. NICKLES (Thomas L. Cubbage III, of counsel, Oscar M. Garibaldi and Elie Honig, on the brief), Covington & Burling, Washington, D.C., for Defendant-Appellee.
 Richard L. Herz, EarthRights International, Washington, D.C., for Amici Curiae International Law Scholars.
 Before: KEARSE, JACOBS and CABRANES, Circuit Judges.
 JOSÉ A. CABRANES, Circuit Judge.
 
 
 1
 The question presented is whether plaintiffs' claims are actionable under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350.[1]
 
 
 2
 Plaintiffs in this case are residents of Ilo, Peru, and the representatives of deceased Ilo residents. They brought personal injury claims under the ATCA against Southern Peru Copper Corporation ("SPCC"), a United States company, alleging that pollution from SPCC's copper mining, refining, and smelting operations in and around Ilo caused plaintiffs' or their decedents' severe lung disease. The ATCA states that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Plaintiffs claimed that defendant's conduct violates the "law of nations" —commonly referred to as "international law" or, when limited to non-treaty law, as "customary international law."[2] In particular, they asserted that defendant infringed upon their customary international law "right to life," "right to health," and right to "sustainable development."
 
 
 3
 The United States District Court for the Southern District of New York (Charles S. Haight, Jr., Judge), held that plaintiffs had failed to establish subject matter jurisdiction or to state a claim under the ATCA because they had not alleged a violation of customary international law—i.e., that they had not "demonstrated that high levels of environmental pollution within a nation's borders, causing harm to human life, health, and development, violate well-established, universally recognized norms of international law." Flores v. Southern Peru Copper Corp., 253 F.Supp.2d 510, 525 (S.D.N.Y.2002) (internal quotation marks omitted). The Court further held that even if plaintiffs had alleged a violation of customary international law, the case would have to be dismissed on forum non conveniens grounds because Peru provides an adequate alternative forum for plaintiffs' claims and because the relevant public and private interest factors weigh heavily in favor of the Peruvian forum. Id. at 544. Accordingly, the District Court granted defendant's motion to dismiss.
 
 BACKGROUND
 I. Statement of the Case
 
 4
 In reviewing a ruling on a motion to dismiss, we accept as true all well-pleaded factual allegations set forth in the complaint. See, e.g., Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Resnik v. Swartz, 303 F.3d 147, 150-51 (2d Cir.2002). We recount below only such facts as are necessary to our disposition of this appeal.
 
 
 5
 Plaintiffs in this case are residents of Ilo, Peru, and the representatives of deceased Ilo residents. Defendant, SPCC, is a United States corporation headquartered in Arizona with its principal place of operations in Peru. It is majority-owned by Asarco Incorporated ("Asarco"), a Delaware corporation with its principal place of business in Peru. Asarco is a wholly-owned subsidiary of Grupo Mexico, S.A. de C.V., which is a Mexican corporation with its principal place of business in Mexico City. SPCC has operated copper mining, refining, and smelting operations in and around Ilo since 1960.
 
 
 6
 SPCC's operations emit large quantities of sulfur dioxide and very fine particles of heavy metals into the local air and water. Plaintiffs claim that these emissions have caused their respiratory illnesses and that this "egregious and deadly" local pollution constitutes a customary international law offense because it violates the "right to life," "right to health," and right to "sustainable development." Am. Compl. ¶¶ 1, 59-75.[3]
 
 
 7
 SPCC's activities, as well as their environmental impact, are regulated by the government of Peru. Since 1960, commissions of the Peruvian government have conducted annual or semi-annual reviews of the impact of SPCC's activities on the ecology and agriculture of the region. These commissions have found that SPCC's activities have inflicted environmental damage affecting agriculture in the Ilo Valley and have required SPCC to pay fines and restitution to area farmers. In addition to imposing fines and permitting area residents to seek restitution, the government of Peru also has required SPCC to modify its operations in order to abate pollution and other environmental damage. Under the direction of Peru's Ministry of Energy and Mines ("MEM"), SPCC has conducted studies to ascertain the environmental impact of its operations and the technical and economic feasibility of abating that impact.[4] SPCC is required to meet levels of emissions and discharges set by the MEM under Peruvian environmental laws enacted in 1993, and is subject to the jurisdiction of the courts of Peru.[5]
 
 II. Proceedings Before the District Court
 A. Procedural History
 
 8
 Plaintiffs commenced this action by filing a complaint on December 28, 2000. They filed an Amended Complaint on February 7, 2001. On March 5, 2001, SPCC filed a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state a claim, arguing that plaintiffs failed to allege a violation of the law of nations. SPCC also moved to dismiss the Amended Complaint on the grounds of forum non conveniens and international comity, and moved, in the alternative, for summary judgment pursuant to Fed. R.Civ.P. 56. While these motions were pending, the District Court requested, and the parties provided, extensive supplemental briefing to apprise the Court fully of all relevant questions of customary international law and of the adequacy of the Peruvian forum.
 
 B. The District Court's Opinion
 
 9
 On July 16, 2002, the District Court filed a comprehensive and scholarly opinion in which it carefully analyzed plaintiffs' claims and documentary evidence. The District Court held that plaintiffs had failed to state a claim under the ATCA because they had not pleaded a violation of any cognizable principle of customary international law. Flores, 253 F.Supp.2d at 525. The Court noted that it did not need to reach the question of forum non conveniens because it had determined that it lacked subject matter jurisdiction, but it nonetheless concluded that, even if plaintiffs had pleaded a violation of customary international law, dismissal on the ground of forum non conveniens would have been appropriate. Id. at 544.
 
 
 10
 In its analysis, the District Court discussed the requirements for a claim under the ATCA. It noted that "[t]he ATCA provides for federal court jurisdiction where a plaintiff's claim involves a violation of [i] a treaty of the United States or [ii] the law of nations, which consists of rules that `command the general assent of civilized nations.'" Id. at 513-14 (quoting Filartiga v. Pena-Irala, 630 F.2d 876, 881 (2d Cir.1980) (internal quotation marks omitted)). Because plaintiffs did not claim any violation of a United States treaty, the Court turned to the issue of whether plaintiffs had alleged a violation of customary international law. Id. at 514. The District Court noted that, in order to allege a violation of customary international law, "a plaintiff must demonstrate that a defendant's alleged conduct violated `well-established, universally recognized norms of international law.'" Flores, 253 F.Supp.2d at 514 (quoting Filartiga, 630 F.2d at 888; citing Kadic v. Karadzic, 70 F.3d 232, 239 (2d Cir.1995)).
 
 
 11
 The District Court rejected plaintiff's suggestion that, "in order to distinguish ordinary torts from torts that violate [customary] international law, courts should `make a factual inquiry into whether the allegations rise to the level of egregiousness and intentionality required to state a claim under international law.'" Flores, 253 F.Supp.2d at 522. It held that "[p]laintiffs' suggested approach—a factual assessment to determine whether the defendant's alleged conduct is `shockingly egregious'—would displace the agreement of nations as the source of customary international law and substitute for it the consciences and sensibilities of individual judges." Id. at 523. Instead, the Court applied our instruction in Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980), that courts should seek "to determine whether a rule is well-established and universally recognized `by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.'" Flores, 253 F.Supp.2d at 514 (quoting Filartiga, 630 F.2d at 880 (quoting United States v. Smith, 18 U.S. (5 Wheat.) 153, 160-61, 5 L.Ed. 57 (1820)) (internal quotation marks omitted)).
 
 
 12
 In analyzing whether the conduct alleged violated well-established and universally recognized rules of customary international law, the District Court examined ATCA cases from both inside and outside of this Circuit presenting similar claims. The District Court turned first to a decision from the Southern District of New York, Aguinda v. Texaco, Inc., 142 F.Supp.2d 534 (S.D.N.Y.2001), in which citizens of Peru and Ecuador sued Texaco under the ATCA for damages resulting from alleged severe, intra-national environmental pollution, claiming that such pollution constituted a violation of the law of nations. The district court in Aguinda ultimately granted defendant's motion to dismiss on forum non conveniens grounds, but noted that "the specific claim plaintiffs purport to bring under the ATCA — that the Consortium's oil extraction activities violated evolving environmental norms of customary international law ... — lacks any meaningful precedential support and appears extremely unlikely to survive a motion to dismiss." Aguinda, 142 F.Supp.2d at 552. We affirmed the decision on the ground of forum non conveniens. Aguinda, 303 F.3d 470 (2d Cir. 2002).
 
 
 13
 The District Court then looked to another case from the Southern District of New York, Amlon Metals, Inc. v. FMC Corp., 775 F.Supp. 668 (S.D.N.Y.1991), which had rejected the notion that environmental torts can violate customary international law. Flores, 253 F.Supp.2d at 516. In support of their claim that delivery of deliberately-mislabeled toxic waste violates customary international law, the Amlon Metals plaintiffs relied on documents similar to, and in some cases the same as, those relied on by plaintiffs here to support analogous claims that the SPCC's alleged environmental torts violate the rights to life and health. Amlon Metals, 775 F.Supp. at 671. In particular, the Amlon Metals plaintiffs relied on the Stockholm Declaration on the Human Environment ("Stockholm Declaration" or "Stockholm Principles"), United Nations Conference on the Human Environment, Stockholm, Sweden, June 16, 1972, 11 I.L.M. 1416, and on the Restatement (Third) of the Foreign Relations Law of the United States ("Restatement (Third)") § 602(2) (1987).[6] The Amlon Metals Court rejected the Stockholm Principles as evidence of customary international law because they "do not set forth any specific proscriptions, but rather refer only in a general sense to the responsibility of nations," and it rejected the relevant passage of the Restatement (Third) because it does not "constitute a statement of universally recognized principles of international law." Amlon Metals, 775 F.Supp. at 671.[7]
 
 
 14
 The District Court also analyzed a recent Fifth Circuit case, Beanal v. Freeport-McMoran, Inc., 197 F.3d 161 (5th Cir.1999). Flores, 253 F.Supp.2d at 517. In Beanal, as in the instant case, a citizen of a foreign State (Indonesia) brought suit under the ATCA against U.S.-owned corporations operating in that State, alleging that its mining activities caused damage to human health and to the environment in violation of customary international law. Beanal, 197 F.3d at 163.[8] Like the plaintiffs here, the Beanal plaintiff relied on several resolutions of the United Nations ("U.N."), an affidavit of an international law professor, and the Rio Declaration on Environment and Development, United Nations Conference on Environment and Development, Rio de Janeiro, Brazil, June 13, 1992, Principle 1, 31 I.L.M. 874. Beanal, 197 F.3d at 167. The Fifth Circuit held that the plaintiff had not demonstrated the existence of a rule of customary international law applicable to the alleged actions, explaining that the plaintiff had fail[ed] to show that these treaties and agreements enjoy universal acceptance in the international community. The sources of international law cited by Beanal ... merely refer to a general sense of environmental responsibility and state abstract rights and liberties devoid of articulable or discernable standards and regulations to identify practices that constitute international environmental abuses or torts.... Furthermore, the argument to abstain from interfering in a sovereign's environmental practices carries persuasive force especially when the alleged environmental torts and abuses occur within the sovereign's borders and do not affect neighboring countries.
 
 
 15
 
 Id.
 
 
 
 16
 After examining the above cases, the District Court reviewed in detail plaintiffs' voluminous submissions, which included the declarations of multinational organizations, non-ratified treaties, and "brief"-like affidavits of law professors, and found them indistinguishable from those that other courts have deemed to be insufficient evidence of a customary international law rule against intra-national environmental pollution. Flores, 253 F.Supp.2d at 519.
 
 
 17
 The District Court also rejected plaintiffs' argument that the cases discussed above are distinguishable because the claims at issue in those cases were based on asserted customary international law prohibitions on environmental pollution, rather than on the broader customary international law rights to life and health. The Court concluded that, no matter how plaintiffs specifically defined the alleged customary international law violations, "plaintiffs ha[d] not demonstrated that high levels of environmental pollution ... violate any well-established rules of customary international law." Flores, 253 F.Supp.2d at 519. The Court held that the submissions presented by plaintiffs were insufficient to substantiate a violation of customary international law because the "documents speak in terms of `rights,' but they do not identify any prohibited conduct that is relevant to this case." Id.
 
 
 18
 The District Court ultimately concluded that plaintiffs' claims should be dismissed for lack of subject matter jurisdiction and because plaintiffs had failed to state a claim under the ATCA. In order to facilitate appellate review, the District Court also considered defendant's alternative argument that plaintiff's claims should be dismissed pursuant to the doctrine of forum non conveniens. After extensively analyzing the relevant factors, the Court concluded that, even if plaintiffs had stated a claim under the ATCA, the case would have to be dismissed on forum non conveniens grounds. Id. at 544.[9] The Court declined to reach defendant's arguments with respect to international comity.
 
 
 19
 On appeal, plaintiffs claim that the District Court erred in declining to recognize customary international law rights to life and health and in concluding that such rights were not sufficiently determinate to constitute "well-established, universally recognized norms of international law." Filartiga, 630 F.2d at 888. They also challenge the District Court's refusal to accord sufficient probative value to the numerous professorial affidavits, conventions, and declarations of multinational organizations that plaintiffs submitted in support of their claims. With respect to defendant's forum non conveniens claim, plaintiffs claim that the District Court erred in concluding that Peru provides an adequate alternative forum.
 
 DISCUSSION
 I. Standard of Review
 
 20
 We review de novo a district court's grant of a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. See, e.g., AmBase Corp. v. City Investing Co. Liquidating Trust, 326 F.3d 63, 71-72 (2d Cir.2003); SEC v. Berger, 322 F.3d 187, 191 (2d Cir.2003). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).
 
 
 21
 A district court's decision to dismiss a case on the ground of forum non conveniens "lies wholly within the broad discretion of the district court and may be overturned only when we believe that discretion has been clearly abused." Iragorri v. United Techs. Corp., 274 F.3d 65, 72 (2d Cir.2001) (en banc) (internal quotation marks and citation omitted).
 
 II. The Alien Tort Claims Act
 A. History of the ATCA
 
 22
 The Alien Tort Claims Act, 28 U.S.C. § 1350, states in full: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." Id. This language is derived with little alteration from the first congressional statute on the judiciary, the Judiciary Act of 1789, ch. 20, § 9(b), 1 Stat. 73, 76-77 (codified as amended at 28 U.S.C. § 1350 (2000)).[10]
 
 
 23
 On its face, the statute specifies that, to state a claim, plaintiffs must (i) be "aliens," (ii) claiming damages for a "tort only," (iii) resulting from a violation "of the law of nations" or of "a treaty of the United States." 28 U.S.C. § 1350; see Kadic, 70 F.3d at 238; Filartiga, 630 F.2d at 887. The intended purpose and scope of the ATCA never have been definitively established by legal historians or by the Supreme Court, and the ATCA lacks a legislative history that could provide courts with guidance as to its intended meaning.[11] Some scholars have posited that Congress intended the ATCA only to address claims arising out of the law of prize, which governs the right to intercept enemy merchant vessels during wartime.[12] Others have argued that the ATCA provides a remedy only for those violations of international law recognized in 1789, when the ATCA was first enacted—namely, claims arising under the law of prize, offenses against ambassadors,[13] and acts of piracy.[14] Still others contend that the ATCA was intended to provide a broad remedy for all torts in violation of international law, as that body of law might evolve over time.[15] In sum, as Judge Henry J. Friendly, a distinguished student and practitioner of international law before his appointment to the federal bench, wrote for our Court in IIT v. Vencap, Ltd., 519 F.2d 1001 (2d Cir.1975), the ATCA "is a kind of legal Lohengrin ... no one seems to know whence it came." Id. at 1015.[16]
 
 1. The Filartiga Decision
 
 24
 Questions regarding the purpose and scope of the ATCA did not attract substantial judicial attention until the latter part of the Twentieth Century, when the ATCA was first recognized by a federal appellate court as a viable basis for relief in Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980). In an opinion by Judge Irving R. Kaufman, our Court held that the ATCA afforded subject matter jurisdiction over the claim of two citizens of Paraguay that a former Paraguayan police inspector-general tortured and killed a member of their family in Paraguay in violation of the customary international law prohibition against official torture. Id. at 880, 884. By allowing the plaintiffs' claim to proceed, the Filartiga Court not only held that the ATCA provides a jurisdictional basis for suit, but also recognized the existence of a private right of action for aliens only seeking to remedy violations of customary international law or of a treaty of the United States.[17]
 
 
 25
 In determining whether the plaintiffs had alleged a violation of the law of nations, the Filartiga Court first identified the appropriate sources of customary international law, holding that "[t]he law of nations `may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognising and enforcing that law.'" Id. at 880 (quoting United States v. Smith, 18 U.S. (5 Wheat.) 153, 160-61, 5 L.Ed. 57 (1820)). Then, addressing the issue of the ATCA's scope, it determined that, in considering whether a plaintiff has alleged a violation of customary international law, a court "must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." Id. at 881; accord Kadic, 70 F.3d at 241; Kadic v. Karadzic, 74 F.3d 377, 378 (2d Cir.1996) (denying petition for rehearing). In order for a principle to have "ripened ... into `a settled rule of international law,'" it must command "`the general assent of civilized nations.'" Filartiga, 630 F.2d at 881 (quoting Paquete Habana, 175 U.S. 677, 694, 20 S.Ct. 290, 44 L.Ed. 320 (1900)).
 
 
 26
 The Filartiga Court distinguished previous ATCA cases on the ground that "earlier cases did not involve such well-established, universally recognized norms of international law that are here at issue." Id. at 888. It held that conduct violates such norms of customary international law "only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords[.]" Id. (citing Vencap, 519 F.2d at 1015) (emphases added). The Filartiga Court concluded that acts of torture committed by State officials violate "established norms of the international law of human rights, and hence the law of nations." Filartiga, 630 F.2d at 880.
 
 
 27
 Although Filartiga involved only the conduct of State officials, since then another panel of our Court held, in Kadic v. Karadzic, 70 F.3d 232 (2d Cir.1995), that ATCA claims may sometimes be brought against private actors. The Court concluded in Kadic that certain activities are of "universal concern" and therefore constitute violations of customary international law not only when they are committed by state actors, but also when they are committed by private individuals. Kadic, 70 F.3d at 239-40. In particular, it determined that acts of piracy, slave trading, war crimes, and genocide violate customary international law regardless of whether they are undertaken by state or private actors, whereas acts of official torture and "summary execution" constitute violations of customary international law only when committed by state officials or under color of law. Kadic, 70 F.3d at 239-43[18].
 
 2. Reception of Filartiga
 
 28
 Filartiga's interpretation of the ATCA as permitting private causes of action for recently identified violations of customary international law has been controversial.[19] The Ninth and Eleventh Circuits have followed Filartiga in recognizing a private cause of action under the ATCA. See Abebe-Jira v. Negewo, 72 F.3d 844, 848 (11th Cir.1996) (holding that "the Alien Tort Claims Act establishes a federal forum where courts may fashion domestic common law remedies to give effect to violations of customary international law"); Hilao v. Estate of Marcos (In re Estate of Ferdinand Marcos, Human Rights Litig.), 25 F.3d 1467, 1475 (9th Cir.1994) ("We thus join the Second Circuit in concluding that the [ATCA] creates a cause of action for violations of specific, universal and obligatory international human rights standards[.]").
 
 
 29
 However, the District of Columbia Circuit has criticized Filartiga in concurring opinions in both Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir.1984) (Bork, J., concurring, and Robb, J., concurring), and Al Odah v. United States, 321 F.3d 1134, 1146 (D.C.Cir.2003) (Randolph, J., concurring). The concurring opinions of Judge Bork and Judge Robb in Tel-Oren and the concurring opinion of Judge Randolph in Al Odah reject Filartiga's holding that the ATCA creates a private right of action for violations of United States treaties or customary international law. See Al Odah, 321 F.3d at 1146-47 (Randolph, J., concurring); Tel-Oren, 726 F.2d at 811 (Bork, J., concurring); id. at 826 (Robb, J., concurring). The rejection of Filartiga's understanding of the ATCA by two of the three judges on the Tel-Oren panel suggests that the law of the District of Columbia Circuit stands in contrast to that of our Circuit and of the other Circuits that have followed our holding in Filartiga. See Al Odah, 321 F.3d at 1146 (Randolph, J., concurring) ("The meaning of § 1350 has been an open question in our court. But what § 1350 does not mean has been decided. In the Tel-Oren case both Judge Bork and Judge Robb, in their separate concurring opinions, rejected the Second Circuit's Filartiga decision...." (internal citations omitted)).
 
 
 30
 Judge Bork in Tel-Oren and Judge Randolph in Al Odah construed the ATCA to be purely jurisdictional and rejected the position that customary international law is part of general federal common law that courts may apply absent a specific statutory grant. See Al Odah, 321 F.3d at 1146-47 (Randolph, J., concurring); Tel-Oren, 726 F.2d at 801, 811 (Bork, J., concurring). According to Judge Randolph, "[t]o hold that the [ATCA] creates a cause of action..., as the Filartiga [line of] decisions indicate[s], would be to grant aliens greater rights in the nation's courts than American citizens enjoy." Al Odah, 321 F.3d at 1146. But see Torture Victim Protection Act of 1991 (cited in full and discussed below) (granting a cause of action to American citizens who are victims of torture abroad). Judge Robb in Tel-Oren took a different position, arguing that the political question doctrine prohibits courts from "determin[ing] the international status of terrorist acts" at issue in that case. See Tel-Oren, 726 F.2d at 823 (Robb, J., concurring).
 
 
 31
 In Al Odah, Judge Randolph went further in his criticism of Filartiga, maintaining that our Circuit's interpretation of the ATCA renders the statute unconstitutional because it permits the federal courts to define the law of nations. Al Odah, 321 F.3d at 1147 (Randolph, J., concurring). According to Judge Randolph, the Constitution grants exclusively to Congress the authority to "define and punish ... Offences against the Law of Nations." Id. (quoting U.S. Const. art. I, § 8, cl. 10) (internal quotation marks omitted) (emphasis added). Analyzing the legislative history of this clause, commonly referred to as the "Define and Punish Clause," Judge Randolph noted that "the Framers' original draft merely stated that Congress had the power to punish offenses against the law of nations, but when Gouverneur Morris ... objected that the law of nations was `often too vague and deficient to be a rule,' the clause was amended to its present form [which also gives Congress power to define such offenses]." Al Odah, 321 F.3d at 1147 (citation omitted) (emphasis added). "[I]n light of the history" of the Define and Punish Clause, Judge Randolph argued, "it [is] abundantly clear that Congress — not the Judiciary — is to determine, through legislation, what international law is and what violations of it ought to be cognizable in the courts." Id. Yet Judge Randolph noted that "under Filartiga, it is the courts, not Congress who decide both questions." Id.
 
 
 32
 The Supreme Court has not yet addressed whether the ATCA permits a cause of action for violations of customary international law as that body of law has evolved since 1789, or, indeed, whether Filartiga's interpretation of the ATCA is consistent with the Constitution. The Court has only once considered a claim brought under the ATCA, in Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989), and, in that case, it dismissed the plaintiffs' claims on sovereign immunity grounds, holding that the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-11, bars most suits against foreign sovereigns, including those brought under the ATCA. Amerada Hess, 488 U.S. at 434-35, 109 S.Ct. 683.
 
 
 33
 Nor has Congress wholly clarified the scope and meaning of the ATCA. However, following our Court's decision in Filartiga, Congress did pass the Torture Victim Protection Act of 1991 ("TVPA"), Pub.L. No. 102-256, 106 Stat. 73 (enacted March 12, 1992) (codified as Note to 28 U.S.C. § 1350), which created a cause of action for individuals subjected to official torture or extrajudicial executions.[20] The TVPA is appended as a statutory note to the ATCA, codified at 28 U.S.C. § 1350.[21] The TVPA reaches conduct that may also be covered by the ATCA, but the TVPA "enhance[s] the remedy already available under the [ATCA] in an important respect: while the [ATCA] provides a remedy to aliens only, the TVPA ... extend[s] a civil remedy also to U.S. citizens who may have been tortured abroad." S.Rep. No. 102-249, at 5 (1991).
 
 
 34
 The Senate Report on the TVPA states that the statute was intended to "establish an unambiguous basis for a cause of action that has been successfully maintained under [the ATCA,] ... which permits Federal district courts to hear claims by aliens for torts committed `in violation of the law of nations.'" Id. at 4. The Report specifically referred to Filartiga and noted that "[t]he Filartiga case has met with general approval." Recognizing that "[a]t least one Federal judge ... has questioned whether [the ATCA] can be used by victims of torture committed in foreign nations absent an explicit grant of a cause of action by Congress," id. (citing Tel-Oren, 726 F.2d at 774 (Bork, J., concurring)), the Senate Report concluded that "[t]he TVPA would provide such a grant," id. at 5.
 
 
 35
 Our Court has concluded that Congress intended to ratify our holding in Filartiga with respect to torture by passing the TVPA. See Kadic, 70 F.3d at 241; Kadic, 74 F.3d at 378 (denying petition for rehearing); see also Hilao, 25 F.3d at 1475-76; Abebe-Jira, 72 F.3d at 848. Others have suggested that the TVPA actually created a cause of action independent of the ATCA, and that such a cause of action is not reliant on the ATCA for jurisdiction, but instead may be based on 28 U.S.C. § 1331 — the general statute establishing federal question jurisdiction. See, e.g., Al Odah, 321 F.3d at 1146 (Randolph, J., concurring); Casto, note 19, ante, at 479-80.
 
 
 36
 In sum, neither Congress nor the Supreme Court has definitively resolved the complex and controversial questions regarding the meaning and scope of the ATCA. Whatever the differing perspectives among judges and scholars — differences that ultimately can be resolved only by Congress or the Supreme Court — Filartiga remains the law of this Circuit, and we analyze plaintiffs' claims under the framework set forth in that case and its progeny.
 
 
 37
 B. The "Law of Nations"
 
 
 38
 1. Definition of "Law of Nations," or "Customary International Law," for Purposes of the ATCA
 
 
 39
 The ATCA permits an alien to assert a cause of action in tort for violations of a treaty of the United States and for violations of "the law of nations," which, as used in this statute, refers to the body of law known as customary international law. 28 U.S.C. § 1350; see also note 2, ante. The determination of what offenses violate customary international law, however, is no simple task. Customary international law is discerned from myriad decisions made in numerous and varied international and domestic arenas. Furthermore, the relevant evidence of customary international law is widely dispersed and generally unfamiliar to lawyers and judges. These difficulties are compounded by the fact that customary international law — as the term itself implies — is created by the general customs and practices of nations and therefore does not stem from any single, definitive, readily-identifiable source.[22] All of these characteristics give the body of customary international law a "soft, indeterminate character," Louis Henkin, International Law: Politics and Values 29 (1995), that is subject to creative interpretation. See Amerada Hess Shipping Corp. v. Argentine Republic, 830 F.2d 421, 429 (2d Cir.1987) (Kearse, J., dissenting) (noting the problem of allowing jurisdiction to "ebb and flow with the vicissitudes of `evolving standards of international law' "), rev'd, 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Accordingly, in determining what offenses violate customary international law, courts must proceed with extraordinary care and restraint.
 
 
 40
 In short, customary international law is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern.
 
 
 41
 First, in order for a principle to become part of customary international law, States must universally abide by it. Filartiga, 630 F.2d at 888 (holding that customary international law includes only "well-established, universally recognized norms of international law") (emphasis added); see also Kadic, 70 F.3d at 239 (quoting Filartiga, 630 F.2d at 888); id. at 243 n. 8 (addressing whether a principle had "ripened into universally accepted norms of international law" (emphasis added)). Of course, States need not be universally successful in implementing the principle in order for a rule of customary international law to arise. If that were the case, there would be no need for customary international law. But the principle must be more than merely professed or aspirational.
 
 
 42
 Furthermore, a principle is only incorporated into customary international law if States accede to it out of a sense of legal obligation. See, e.g., Chubb & Son, Inc. v. Asiana Airlines, 214 F.3d 301, 307-08 (2d Cir.2000) ("Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation." (quoting Restatement (Third) § 102(2)) (internal quotation marks omitted) (emphasis added)). Practices adopted for moral or political reasons, but not out of a sense of legal obligation, do not give rise to rules of customary international law. See Hain v. Gibson, 287 F.3d 1224, 1243-44 (10th Cir. 2002) (noting that customary international law does not include those practices that States have adopted "for moral or political reasons (as opposed to any sense of legal obligation)" (internal quotation marks and citation omitted)); North Sea Continental Shelf (Federal Republic of Germany v. Denmark; Federal Republic of Germany v. The Netherlands), 1969 I.C.J. 3, 44 ("[n]ot only must the acts concerned amount to a settled practice, but they must also be ... carried out in such a way[] as to be evidence of a belief that this practice is rendered obligatory by the existence of a rule of law requiring it").
 
 
 43
 Finally, customary international law addresses only those "wrong[s]" that are "of mutual, and not merely several, concern" to States. Filartiga, 630 F.2d at 888 (emphases added); see IIT v. Vencap, Ltd., 519 F.2d 1001, 1015 (2d Cir.1975) (Friendly, J.) (defining customary international law as those "standards, rules or customs (a) affecting the relationship between states or between an individual and a foreign state, and (b) used by those states for their common good and/or in dealings inter se" (citation and internal quotation marks omitted)).[23] Matters of "mutual" concern between States are those involving States' actions "performed ... towards or with regard to the other," X Oxford English Dictionary 154 (2d ed.1989) — matters that, as Judge Friendly aptly noted, concern the dealings of States "inter se," Vencap, 519 F.2d at 1015. Matters of "several" concern among States are matters in which States are separately and independently interested. See XV Oxford English Dictionary 97 (2d ed.1989) (defining "several" as having "a position, existence, or status apart[,] separate, [or] distinct" from one another).
 
 
 44
 Even if certain conduct is universally proscribed by States in their domestic law, that fact is not necessarily significant or relevant for purposes of customary international law. As we explained in Filartiga and in IIT v. Vencap, Ltd., 519 F.2d 1001 (2d Cir.1975):
 
 
 45
 [T]he mere fact that every nation's municipal [i.e., domestic] law may prohibit theft does not incorporate "the Eighth Commandment, `Thou Shalt not steal'... [into] the law of nations." It is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the statute.
 
 
 46
 Filartiga, 630 F.2d at 888 (quoting Vencap, 519 F.2d at 1015) (emphasis added). Therefore, for example, murder of one private party by another, universally proscribed by the domestic law of all countries (subject to varying definitions), is not actionable under the ATCA as a violation of customary international law because the "nations of the world" have not demonstrated that this wrong is "of mutual, and not merely several, concern." Id. By contrast, other offenses that may be purely intra-national in their execution, such as official torture, extrajudicial killings, and genocide, do violate customary international law because the "nations of the world" have demonstrated that such wrongs are of "mutual ... concern," id., and capable of impairing international peace and security, see, e.g., Louis Henkin, NATO's Kosovo Intervention: Kosovo and the Law of "Humanitarian Intervention," 93 Am. J. Int'l L. 824, 826 (1999) (discussing the "responsibility of the world community to address threats to international peace and security resulting from genocide and other crimes against humanity"); Brigadier General Telford Taylor, U.S.A., Chief of Counsel for War Crimes, Final Report to the Secretary of the Army on the Nuernberg War Crimes Trials Under Control Council Law No. 10, at 109 (William S. Hein & Co., Inc. 1997) (Aug. 15, 1949) (discussing a decision of the Nuremberg war crimes tribunal holding that certain "crimes against humanity" are proscribed by customary international law in part because of "[t]he force of circumstance" and "the grim fact of worldwide interdependence").
 
 
 47
 2. Sources and Evidence of Customary International Law
 
 
 48
 In determining whether a particular rule is a part of customary international law — i.e., whether States universally abide by, or accede to, that rule out of a sense of legal obligation and mutual concern — courts must look to concrete evidence of the customs and practices of States. As we have recently stated, "we look primarily to the formal lawmaking and official actions of States and only secondarily to the works of scholars as evidence of the established practice of States." United States v. Yousef, 327 F.3d 56, 103 (2d Cir.2003); see also United States v. Smith, 18 U.S. (5 Wheat.) 153, 160-61, 5 L.Ed. 57 (1820) (Story, J.) (identifying "the general usage and practice of nations[;] ... judicial decisions recognising and enforcing that law[;]" and "the works of jurists, writing professedly on public laws" as the proper sources of customary international law); see also Filartiga, 630 F.2d at 880 (quoting Smith).
 
 
 49
 In United States v. Yousef, we explained why the usage and practice of States — as opposed to judicial decisions or the works of scholars — constitute the primary sources of customary international law. 327 F.3d at 99-103. In that case, we looked to the Statute of the International Court of Justice ("ICJ Statute") — to which the United States and all members of the United Nations are parties[24] — as a guide for determining the proper sources of international law. See Yousef, 327 F.3d at 100-103; see also Filartiga, 630 F.2d at 881 & n. 8 (citing Article 38 as an authoritative statement of the sources of international law). Article 38 of the ICJ Statute provides in relevant part:
 
 
 50
 1. The Court, whose function is to decide in accordance with international law such disputes as are submitted to it, shall apply:
 
 
 51
 a. international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
 
 
 52
 b. international custom, as evidence of a general practice accepted as law;
 
 
 53
 c. the general principles of law recognized by civilized nations;
 
 
 54
 d. subject to the provisions of Article 59,[25] judicial decisions and the teachings of the most highly qualified publicists [i.e., scholars or "jurists"] of the various nations, as subsidiary means for the determination of rules of law.
 
 
 55
 ICJ Statute, June 26, 1945, art. 38, 59 Stat. 1055, 1060, U.S.T.S. 993 (emphasis added).
 
 
 56
 Article 38 embodies the understanding of States as to what sources offer competent proof of the content of customary international law. It establishes that the proper primary evidence consists only of those "conventions" (that is, treaties) that set forth "rules expressly recognized by the contesting states," id. at 1(a) (emphasis added), "international custom" insofar as it provides "evidence of a general practice accepted as law," id. at 1(b) (emphasis added), and "the general principles of law recognized by civilized nations," id. at 1(c) (emphasis added). It also establishes that acceptable secondary (or "subsidiary") sources summarizing customary international law include "judicial decisions," and the works of "the most highly qualified publicists," as that term would have been understood at the time of the Statute's drafting.[26]
 
 
 57
 Notably absent from Article 38's enumeration of the sources of international law are conventions that set forth broad principles without setting forth specific rules — in the words of Filartiga, "clear and unambiguous" rules, 630 F.2d at 884. Such a regime makes sense because, as a practical matter, it is impossible for courts to discern or apply in any rigorous, systematic, or legal manner international pronouncements that promote amorphous, general principles. See Beanal v. Freeport-McMoran, Inc., 197 F.3d 161, 167 (5th Cir.1999) (concluding that customary international law cannot be established by reference to "abstract rights and liberties devoid of articulable or discernable standards and regulations"). Moreover, as noted above, customs or practices based on social and moral norms, rather than international legal obligation, are not appropriate sources of customary international law because they do not evidence any intention on the part of States, much less the community of States, to be legally bound. See, e.g., Clive Parry, The Sources and Evidences of International Law 2 (1965) ("The basis of international law as a system and of the rules of which it is composed is the consent of States." (emphasis omitted)).
 
 
 58
 Our recapitulation of the proper sources of international law is not novel. As one eminent authority has observed, "[t]he records or evidence, of international law are the documents or acts proving the consent of States to its rules," and "[a]mong such records or evidence, treaties and practice play an essential part." Id. at 2. Professor Parry's statement of the proper evidence of customary international law correctly emphasizes that the "acts" and "practice[s]" of States constitute the "essential" evidence of whether States follow a rule as a legal obligation. Id. (emphasis omitted). He also notes that recourse may be had to secondary sources such as "unilateral declarations, instructions to diplomatic agents, laws and ordinances, and in a lesser degree, to the writings of authoritative jurists," id. (emphasis added), as evidence of the "acts" and "practice[s]" of States, id. (emphasis omitted).
 
 
 59
 In sum, those clear and unambiguous rules by which States universally abide, or to which they accede, out of a sense of legal obligation and mutual concern, constitute the body of customary international law. But where the customs and practices of States demonstrate that they do not universally follow a particular practice out of a sense of legal obligation and mutual concern, that practice cannot give rise to a rule of customary international law.
 
 
 60
 C. Plaintiffs' Proposed "Egregiousness" Standard is Improper
 
 
 61
 Plaintiffs assert that instead of analyzing ATCA claims under the standards set forth above, courts should "make a factual inquiry into whether the allegations rise to the level of egregiousness and intentionality required to state a claim under international law." Flores, 253 F.Supp.2d at 522 (quoting Tr. of D. Ct. Oral Argument at 36).[27] They propose a "shockingly egregious" standard for distinguishing torts that violate customary international law from those that merely violate domestic law. Because this proposed standard is entirely inconsistent with our understanding of customary international law as set forth both above and in Filartiga, we reject this argument.
 
 
 62
 The term "shockingly egregious" was first used by us in our brief per curiam opinion in Zapata v. Quinn, 707 F.2d 691 (2d Cir.1983). Zapata addressed an alien plaintiff's "unusually frivolous" claim that the New York State Lottery deprived her of property without due process of law when it awarded her lottery winnings to her in an annuity instead of in a lump sum. Id. at 692. She claimed jurisdiction under the ATCA, maintaining that the New York State Lottery had somehow violated the law of nations. Id. In that case, we held as follows:
 
 
 63
 Jurisdiction is lacking under 28 U.S.C. § 1350 (the "alien tort" statute), which applies only to shockingly egregious violations of universally recognized principles of international law, see Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980) (torture). In any event Ms. Zapata clearly fails to state, even by the wildest stretch of imagination, a claim upon which relief can be granted.
 
 
 64
 
 Id.
 
 
 
 65
 Zapata simply restates the law of the Circuit that an action lies under the ATCA only for violations of treaties or customary international law. Id. The phrase "shockingly egregious" is used descriptively, not prescriptively, merely to indicate that "because universal acceptance is a prerequisite to a rule becoming binding as customary international law, only rules prohibiting acts that are `shockingly egregious' are likely to attain that status." Flores, 253 F.Supp.2d at 523. Zapata does not establish "shockingly egregious" as an independent standard for determining whether alleged conduct constitutes a violation of international law. No matter how shocking or egregious an action, it does not provide the basis for a claim under the ATCA unless it violates customary international law.
 
 
 66
 Furthermore, as the District Court concluded, adoption of plaintiffs' proposed "egregiousness" standard would undermine the law of the Circuit in at least three separate ways. First, plaintiffs' proposed standard "would displace the agreement of nations as the source of customary international law and substitute for it the consciences and sensibilities of individual judges." Flores, 253 F.Supp.2d at 523. Second, plaintiffs' standard would shift the subject matter of customary international law from matters of mutual concern between States — between States in their relations "inter se" — to any matter in respect of which "egregious" conduct could occur.[28] Id. at 524. Third, contrary to the requirement that customary international law rules be "clear and unambiguous," Filartiga, 630 F.2d at 884, plaintiffs' "egregiousness" standard would "divert[] attention from universally accepted standards to concepts ... that are easily subject to differing interpretations by the courts of different nations," Flores, 253 F.Supp.2d at 524. We agree in all respects with these three conclusions of the District Court.
 
 
 67
 For the foregoing reasons, the District Court properly rejected plaintiffs' claim that the egregiousness of the conduct alleged bears on whether plaintiffs have stated a claim on which relief can be granted under the ATCA. Instead, in order to state a claim under the ATCA, a plaintiff must allege either a violation of a United States treaty or of a rule of customary international law, as derived from those universally adopted customs and practices that States consider to be legally obligatory and of mutual concern.
 
 
 68
 III. Plaintiffs Have Failed to Allege a Violation of Customary International Law
 
 
 69
 Having established the proper framework for analyzing ATCA claims, we must now decide whether plaintiffs have alleged a violation of customary international law.
 
 
 70
 A. The Rights to Life and Health Are Insufficiently Definite to Constitute Rules of Customary International Law
 
 
 71
 As an initial matter, we hold that the asserted "right to life" and "right to health" are insufficiently definite to constitute rules of customary international law. As noted above, in order to state a claim under the ATCA, we have required that a plaintiff allege a violation of a "clear and unambiguous" rule of customary international law. Filartiga, 630 F.2d at 884 (holding that the prohibition on official torture is "clear and unambiguous" and, as such, can serve as a basis for suit under the ATCA); see id. at 888 (stating that in order to state a claim, a plaintiff must allege a violation of "well-established, universally recognized norms of international law"); Kadic, 70 F.3d at 239 (holding that federal jurisdiction lies under the ATCA if "the defendant's alleged conduct violates `well-established, universally recognized norms of international law' ... as opposed to `idiosyncratic legal rules'" (quoting Filartiga, 630 F.2d at 888, 881)); cf. Beanal v. Freeport-McMoran, Inc., 197 F.3d 161, 167 (5th Cir.1999) (stating that customary international law cannot be established by reference to "abstract rights and liberties devoid of articulable or discernable standards and regulations"); Hilao v. Estate of Marcos (In re Estate of Ferdinand Marcos, Human Rights Litig.), 25 F.3d 1467, 1475 (9th Cir.1994) (stating that a rule of customary international law must be "specific, universal, and obligatory").
 
 
 72
 Far from being "clear and unambiguous," the statements relied on by plaintiffs to define the rights to life and heath are vague and amorphous. For example, the statements that plaintiffs rely on to define the rights to life and health include the following:
 
 
 73
 Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family .... Universal Declaration of Human Rights, Art. 25, G.A. Res. 217A(III), U.N. GAOR, 3d Sess., U.N. Doc. A/810, at 71 (1948).
 
 
 74
 The States Parties to the present Covenant recognize the right of everyone to the enjoyment of the highest attainable standard of physical and mental health.
 
 
 75
 International Covenant on Economic, Social, and Cultural Rights, Art. 12, opened for signature Dec. 19, 1966, 993 U.N.T.S. 3, 6 I.L.M. 360.
 
 
 76
 Human beings are ... entitled to a healthy and productive life in harmony with nature.
 
 
 77
 Rio Declaration on Environment and Development ("Rio Declaration"), United Nations Conference on Environment and Development, Rio de Janeiro, Brazil, June 13, 1992, Principle 1, 31 I.L.M. 874.
 
 
 78
 These principles are boundless and indeterminate. They express virtuous goals understandably expressed at a level of abstraction needed to secure the adherence of States that disagree on many of the particulars regarding how actually to achieve them. But in the words of a sister circuit, they "state abstract rights and liberties devoid of articulable or discernable standards and regulations." Beanal, 197 F.3d at 167. The precept that "[h]uman beings are ... entitled to a healthy and productive life in harmony with nature," Rio Declaration, Principle 1, 31 I.L.M. 874, for example, utterly fails to specify what conduct would fall within or outside of the law. Similarly, the exhortation that all people are entitled to the "highest attainable standard of physical and mental health," International Covenant on Economic, Social, and Cultural Rights, Art. 12, 993 U.N.T.S. 3, proclaims only nebulous notions that are infinitely malleable.
 
 
 79
 In support of plaintiffs' argument that the statements and instruments discussed above are part of customary international law, plaintiffs attempt to underscore the universality of the principles asserted by pointing out that they "contain no limitations as to how or by whom these rights may be violated." Pls.' Br. at 10 (emphasis added). However, this assertion proves too much; because of the conceded absence of any "limitations" on these "rights," they do not meet the requirement of our law that rules of customary international law be clear, definite, and unambiguous.
 
 
 80
 For the foregoing reasons, plaintiffs have failed to establish the existence of a customary international law "right to life" or "right to health."
 
 
 81
 B. Plaintiffs Have Not Submitted Evidence Sufficient to Establish that Customary International Law Prohibits Intranational Pollution
 
 
 82
 Although customary international law does not protect a right to life or right to health, plaintiffs' complaint may be construed to assert a claim under a more narrowly-defined customary international law rule against intranational pollution.[29] However, the voluminous documents and the affidavits of international law scholars submitted by plaintiffs fail to demonstrate the existence of any such norm of customary international law.[30]
 
 
 83
 In support of their claims, plaintiffs have submitted the following types of evidence: (i) treaties, conventions, and covenants; (ii) non-binding declarations of the United Nations General Assembly, (iii) other non-binding multinational declarations of principle; (iv) decisions of multinational tribunals, and (v) affidavits of international law scholars. We analyze each type of evidence submitted by the plaintiffs in turn.
 
 1. Treaties, Conventions, and Covenants
 
 84
 Plaintiffs rely on numerous treaties, conventions, and covenants in support of their claims.[31] Although these instruments are proper evidence of customary international law to the extent that they create legal obligations among the States parties to them, plaintiffs have not demonstrated that the particular instruments on which they rely establish a legal rule prohibiting intranational pollution.
 
 
 85
 Treaties, which sometimes are entitled "conventions" or "covenants," are proper evidence of customary international law because, and insofar as, they create legal obligations akin to contractual obligations on the States parties to them. Like contracts, these instruments are legally binding only on States that become parties to them by consenting to be bound. See Lord McNair, The Law of Treaties 162 (1961) ("[N]o State can be bound by any treaty provision unless it has given its assent ...."). Under general principles of treaty law, a State's signing of a treaty serves only to "authenticat[e]" its text; it "does not establish [the signatory's] consent to be bound." Ian Brownlie, Principles of Public International Law 610-11 (5th ed. 1999). A State only becomes bound by — that is, becomes a party to — a treaty when it ratifies the treaty. See id. at 611; Haver v. Yaker, 76 U.S. (9 Wall.) 32, 35, 19 L.Ed. 571 (1869) (observing that the United States is bound by a treaty only once "the Senate, in whom rests the authority to ratify it, ... agree[s] to it."); Dreyfus v. Von Finck, 534 F.2d 24, 27 n. 3 (2d Cir.1976) (stating that the United States is not a party to an unratified treaty).[32] Accordingly, only States that have ratified a treaty are legally obligated to uphold the principles embodied in that treaty, and the treaty only evidences the customs and practices of those States.
 
 
 86
 All treaties that have been ratified by at least two States provide some evidence of the custom and practice of nations. However, a treaty will only constitute sufficient proof of a norm of customary international law if an overwhelming majority of States have ratified the treaty, and those States uniformly and consistently act in accordance with its principles. The evidentiary weight to be afforded to a given treaty varies greatly depending on (i) how many, and which, States have ratified the treaty, and (ii) the degree to which those States actually implement and abide by the principles set forth in the treaty.
 
 
 87
 With respect to the first of these factors, the more States that have ratified a treaty, and the greater the relative influence of those States in international affairs, the greater the treaty's evidentiary value.[33] With respect to the second of these factors — the degree to which States parties actually implement and abide by the principles set forth in the treaty — the evidentiary value of a treaty increases if the States parties have taken tangible action to implement the principles embodied in the treaty. For example, in the United States, a treaty that is self-executing or that has been executed through an Act of Congress — and therefore gives rise to rights legally enforceable in our courts — provides greater evidence of the customs and practices of the United States than a treaty that has not been executed.[34] Similarly, the evidentiary weight of a treaty increases if States parties have taken official action to enforce the principles set forth in the treaty either internationally or within their own borders.
 
 
 88
 The treaties on which plaintiffs principally rely include: the International Covenant on Civil and Political Rights, opened for signature Dec. 19, 1966, 999 U.N.T.S. 171, 6 I.L.M. 368 (ratified by the United States June 8, 1992); the American Convention on Human Rights, Nov. 22, 1969, 1144 U.N.T.S. 123, 9 I.L.M. 673; the International Covenant on Economic, Social and Cultural Rights, opened for signature Dec. 19, 1966, 993 U.N.T.S. 3, 6 I.L.M. 360; and the United Nations Convention on the Rights of the Child, G.A. Res. 44/25, annex, U.N. GAOR, 44th Sess., Supp. No. 49, at 167, U.N. Doc. A/44/25 (1989), 1577 U.N.T.S. 3, 28 I.L.M. 1448.
 
 
 89
 The only treaty relied on by plaintiffs that the United States has ratified is the non-self-executing International Covenant on Civil and Political Rights ("ICCPR"), opened for signature Dec. 19, 1966, 999 U.N.T.S. 171, 6 I.L.M. 368.[35] In addition to the United States, 148 nations have ratified the ICCPR. See I United Nations, Multilateral Treaties Deposited with the Secretary General 164-65 (2003). Plaintiffs rely on Article 6(1) of the ICCPR, which states that "[e]very human being has the inherent right to life" that "shall be protected by law," and that "[n]o one shall be arbitrarily deprived of his life." As noted above, the "right to life" is insufficiently definite to give rise to a rule of customary international law. Because no other provision of the ICCPR so much as suggests an international law norm prohibiting intranational pollution, the ICCPR does not provide a basis for plaintiffs' claim that defendant has violated a rule of customary international law.
 
 
 90
 Similarly, the American Convention on Human Rights ("American Convention"), Nov. 22, 1969, 1144 U.N.T.S. 123, 9 I.L.M. 673, does not assist plaintiffs because, while it notes the broad and indefinite "[r]ight to [l]ife," id. art. 4, it does not refer to the more specific question of environmental pollution, let alone set parameters of acceptable or unacceptable limits. Moreover, the United States has declined to ratify the American Convention for more than three decades, see Stanford v. Kentucky, 492 U.S. 361, 390, n. 10, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989); see also Garza v. Lappin, 253 F.3d 918, 925 (7th Cir.2001) (noting that "although the United States has signed the American Convention, it has not ratified it, and so that document does not yet qualify as one of the `treaties' of the United States that creates binding obligations"), indicating that this document has not even been universally embraced by all of the prominent States within the region in which it purports to apply.
 
 
 91
 Plaintiffs also rely on the unratified International Covenant on Economic, Social and Cultural Rights ("ICESCR"), opened for signature Dec. 19, 1966, 993 U.N.T.S. 3, 6 I.L.M. 360. This instrument arguably refers to the topic of pollution in article 12, which "recognize[s] the right of everyone to the enjoyment of the highest attainable standard of physical and mental health," id. art. 12(1), and instructs the States parties to take the steps necessary for "[t]he improvement of all aspects of environmental and industrial hygiene," id. art. 12(2)(b). Although article 12(2)(b) instructs States to take steps to abate environmental pollution within their borders, it does not mandate particular measures or specify what levels of pollution are acceptable. Instead, it is vague and aspirational, and there is no evidence that the States parties have taken significant uniform steps to put it into practice. See, e.g., Oona A. Hathaway, Do Human Rights Treaties Make a Difference?, 111 Yale L.J. 1935, 1965 & n.14 (2002) (noting the absence of data indicating compliance of States parties with their obligations under the ICESCR). Finally, even if this provision were sufficient to create a rule of customary international law, the rule would apply only to state actors because the provision addresses only "the steps to be taken by the States Parties," ICESCR art. 12(2) (emphasis added), and does not profess to govern the conduct of private actors such as defendant SPCC.
 
 
 92
 The last treaty on which plaintiffs principally rely is the United Nations Convention on the Rights of the Child, G.A. Res. 44/25, annex, U.N. GAOR, 44th Sess., Supp. No. 49, at 167, U.N. Doc. A/44/25 (1989), 1577 U.N.T.S. 3, 28 I.L.M. 1448, which has not been ratified by the United States, see I United Nations, Multilateral Treaties Deposited with the Secretary-General, at 282-83 (2003). Plaintiffs rely on two sections of the Convention in support of their claims. First, they cite Article 24, section 1, of the Convention, which "recognize[s] the right of the child to the enjoyment of the highest attainable standard of health." This provision does not address the issue of intranational pollution. Moreover, it is extremely vague, clearly aspirational in nature, and does not even purport to reflect the actual customs and practices of States. Plaintiffs also cite Article 24, section 2(c) of the Convention, which instructs States to "take appropriate measures ... [t]o combat disease and malnutrition... through ... the provision of adequate nutritious foods and clean drinking water, taking into consideration the dangers and risks of environmental pollution." While Article 24 of the Convention expressly addresses environmental pollution, it does not attempt to set its parameters or regulate it, let alone to proscribe it. Rather, it instructs States themselves to "consider the dangers and risks of environmental pollution" in determining what measures they deem to be "appropriate" to combat disease and malnutrition. Accordingly, instead of articulating, reflecting, or governing the actual customs and practices of States, the Convention defers to the States' own practices regarding pollution control. Moreover, as with Article 12 of the ICESCR, this provision only addresses concerns as to which "appropriate measures" are to be taken by States themselves, and does not profess to govern the conduct of private parties such as defendant SPCC.
 
 
 93
 For the foregoing reasons, the treaties, conventions or covenants relied on by plaintiffs do not support the existence of a customary international law rule against intranational pollution.
 
 
 94
 2. Non-Binding General Assembly Declarations
 
 
 95
 Plaintiffs rely on several resolutions of the United Nations General Assembly in support of their assertion that defendant's conduct violated a rule of customary international law.[36] These documents are not proper sources of customary international law because they are merely aspirational and were never intended to be binding on member States of the United Nations.
 
 
 96
 The General Assembly has been described aptly as "the world's most important political discussion forum," but it is not a law-making body. I The Charter of the United Nations: A Commentary 248, 269 (Bruno Simma ed., 2d ed.2002). General Assembly resolutions and declarations do not have the power to bind member States because the member States specifically denied the General Assembly that power after extensively considering the issue — first at the Dumbarton Oaks Conference, held in Washington in 1944, then at the Yalta conference in 1945, and finally at the United Nations' founding conference, held in San Francisco in 1945. Id. at 269 (describing the rejection at Dumbarton Oaks and San Francisco of proposals to accord General Assembly resolutions the power to bind member States); cf. Stanley Meisler, United Nations: The First Fifty Years 13-14 (1995) (discussing the Yalta voting formula and the veto power in the Security Council, which alone would be empowered to issue resolutions binding on States).
 
 
 97
 The core constitutive principles that emerged from the three major preparatory conferences that led to the adoption of the United Nations Charter were those creating the General Assembly and the Security Council of the United Nations and setting forth their respective purposes and powers. The simplest and clearest of these organizing principles was that the General Assembly would provide a forum in which all states, small and large, would enjoy formal juridical equality, with the power to discuss virtually anything; however, as part and parcel of that understanding, it was agreed that, apart from certain internal arrangements such as the Organization's budget and other internal and financial matters not pertinent here, the General Assembly's resolutions would not be binding on States. As one contemporary commentator observed:
 
 
 98
 If the Assembly were authorized to take action, to make decisions binding upon the member states, this would mean that it would be the congress or parliament of the world. Had the powers of the Assembly been extended that far, one can be sure that not only the U.S. and Russia, but also France and England, and what are considered the "Middle Powers" (e.g., Brazil and Canada) would have asked for a larger representation. For it is self-evident that they could not have agreed that on vital decisions their powers should be no greater than those, for example, of small states like Nicaragua and Saudi Arabia.
 
 
 99
 Louis Dolivet, The United Nations: A Handbook on the New World Organization 35-36 (1946) (with preface by the first Secretary-General of the United Nations, Trygvie Lie); see also Meisler, United Nations: The First Fifty Years at 10-14.[37]
 
 
 100
 The authority to make pronouncements that could be legally binding was reserved to the Security Council, in which each of the identified Great Powers of the postwar era would be permanent members and hold a veto power. See, e.g., Dolivet, The United Nations: A Handbook on the New World Organization at 45-57 (discussing the composition and function of the Security Council); Meisler, United Nations: The First Fifty Years at 14 (noting that acceptance at the Yalta Conference of the veto power in the Security Council was a sine qua non of the founding of the United Nations); Francis O. Wilcox, The Rule of Unanimity in the Security Council, 40 Am. Soc'y Int'l L. Proc. 51, 52 (1946) (same, discussing the San Francisco Conference). Under the Charter of the United Nations, the Security Council was afforded the power (in circumstances where no veto is exercised by a "permanent member") to issue binding resolutions, United Nations Charter, ch. VII, whereas the General Assembly was granted the power only to "make recommendations to the Members of the United Nations or to the Security Council or to both," United Nations Charter, ch. IV, art. 10 (emphasis added).
 
 
 101
 In sum, as described in The Law of Nations, the classic handbook by Professors Brierly and Waldock of Oxford University:
 
 
 102
 "[A]ll that the General Assembly can do is to discuss and recommend and initiate studies and consider reports from other bodies. It cannot act on behalf of all the members, as the Security Council does, and its decisions are not directions telling the member states what they are or are not to do."
 
 
 103
 J.L. Brierly, The Law of Nations 110 (Sir Humphrey Waldock ed., 6th ed. 1963) (second emphasis added). Because General Assembly documents are at best merely advisory, they do not, on their own and without proof of uniform state practice, see notes 22 and 26, ante, evidence an intent by member States to be legally bound by their principles, and thus cannot give rise to rules of customary international law.
 
 
 104
 Our position is consistent with the recognition in Filartiga that the right to be free from torture embodied in the Universal Declaration of Human Rights, G.A. Res. 217A(III), U.N. GAOR, 3d Sess., U.N. Doc. A/810, at 71 (1948), has attained the status of customary international law. Filartiga cited the Universal Declaration for the proposition that torture is universally condemned, reasoning that "a [United Nations] declaration may by custom become recognized as [a] rule[]" of customary international law. Filartiga, 630 F.2d at 883 (emphasis added) (internal quotation marks and citation omitted). The Court explained that non-binding United Nations documents such as the Universal Declaration "create[] an expectation of adherence," but they evidence customary international law only "insofar as the expectation is gradually justified by State practice." Id. (internal quotation marks and citation omitted) (emphasis added).[38]
 
 
 105
 In considering the Universal Declaration's prohibition against torture, the Filartiga Court cited extensive evidence that States, in their domestic and international practices, repudiate official torture. In particular, it recognized that torture is prohibited under law by, inter alia, the constitutions of fifty-five States, id. at 884 & n. 12, and noted the conclusion expressed by the Executive Branch of our government — the political branch with principal responsibility for conducting the international relations of the United States — that "[t]here now exists an international consensus" against official torture that "virtually all governments acknowledge," id. (quotation marks omitted) (quoting Department of State, Country Reports on Human Rights for 1979, published as Joint Comm. Print, House Comm. on Foreign Affairs, and Senate Comm. on Foreign Relations, 96th Cong.2d Sess. (Feb. 4, 1980), Intro. at 1).[39] Accordingly, although Filartiga did indeed cite the Universal Declaration, this non-binding General Assembly declaration was only relevant to Filartiga's analysis insofar as it accurately described the actual customs and practices of States on the question of torture.
 
 
 106
 In the instant case, the General Assembly documents relied on by plaintiffs do not describe the actual customs and practices of States. Accordingly, they cannot support plaintiffs' claims.[40]
 
 
 107
 3. Other Multinational Declarations of Principle
 
 
 108
 In addition to General Assembly documents, plaintiffs rely on numerous other multinational "declarations" to substantiate their position that defendant's intranational pollution in Peru violated customary international law. A declaration, which may be made by a multinational body, or by one or more States, customarily is a "mere general statement of policy [that] is unlikely to give rise to ... obligation[s] in any strict sense." 1 Oppenheim's International Law 1189 (Sir Robert Jennings & Sir Arthur Watts, eds., 9th ed. 1996). In undertaking the difficult task of determining the contours of customary international law, a court is not granted a roving commission to pick and choose among declarations of public and private international organizations that have articulated a view on the matter at hand. Such declarations are almost invariably political statements — expressing the sensibilities and the asserted aspirations and demands of some countries or organizations — rather than statements of universally-recognized legal obligations. Accordingly, such declarations are not proper evidence of customary international law.
 
 
 109
 Occasionally, a document entitled a "declaration" may actually be a binding treaty because the document uses language indicating the parties' intent to be bound and sets forth "definite rules of conduct." Id.; see, e.g., Iran v. United States (Case A/1), 68 I.L.R. 523, 525 (Iran-U.S. Claims Trib. 1982) (noting that the agreements between the United States and Iran that concluded the hostage crisis were termed "declarations," even though they created legally binding obligations). Only in such rare instances — where the States joining in the self-styled "declaration" intended it to be legally binding — may a party rely on a document entitled a "declaration" as evidence of the customs and practices of the States joining the declaration.
 
 
 110
 Apart from the General Assembly documents addressed above, plaintiffs principally rely on two multinational declarations in support of their claims. First, they draw our attention to the American Declaration of the Rights and Duties of Man ("American Declaration"), O.A.S. Res. XXX (1948), O.A.S. Off. Rec. OEA/Ser. LV/1.4 Rev. (1965), promulgated by the Organization of American States ("OAS"). As one of our sister Circuits has correctly observed, the American Declaration "is an aspirational document which ... did not on its own create any enforceable obligations on the part of any of the OAS member nations." Garza v. Lappin, 253 F.3d 918, 925 (7th Cir.2001).
 
 
 111
 Plaintiffs also rely on Principle 1 of the Rio Declaration, 31 I.L.M. 874, which sets forth broad, aspirational principles regarding environmental protection and sustainable development. The Rio Declaration includes no language indicating that the States joining in the Declaration intended to be legally bound by it.
 
 
 112
 Because neither of these declarations created enforceable legal obligations, they do not provide reliable evidence of customary international law.[41]
 
 4. Decisions of Multinational Tribunals
 
 113
 Plaintiffs also rely on judicial decisions of international tribunals in support of their claims. In particular, they rely on decisions of the International Court of Justice, and on the European Court of Human Rights, a regional institution. But neither of these tribunals is empowered to create binding norms of customary international law. With respect to the International Court of Justice, Article 59 of the ICJ Statute expressly states that "[t]he decision[s] of the Court ha[ve] no binding force except between the parties and in respect of that particular case." ICJ Statute, June 26, 1945, art. 59, 59 Stat. 1055, U.S.T.S. 993.
 
 
 114
 With respect to the European Court of Human Rights, the Court is only empowered to "interpret[]" and "appl[y]" the rules set forth in the European Convention for the Protection of Human Rights and Fundamental Freedoms, opened for signature Apr. 11, 1950, 213 U.N.T.S. 221, E.T.S. No. 5 ("European Convention") — an instrument applicable only to its regional States parties — not to create new rules of customary international law. See European Convention art. 32 (stating that the Court's jurisdiction "extend[s] to all matters concerning the interpretation and application of the Convention"); see also ICJ Statute art. 38 (listing judicial decisions as "subsidiary," rather than primary, sources of customary international law). Accordingly, the international tribunal decisions cited by plaintiffs are not primary sources of customary international law. And while these decisions may constitute subsidiary or secondary sources insofar as they restate and apply the European Convention, nothing in that regional convention addresses pollution, let alone intranational pollution.
 
 
 115
 5. Expert Affidavits Submitted by Plaintiffs
 
 
 116
 Plaintiffs submitted to the District Court several affidavits by international law scholars in support of their argument that strictly intra national pollution violates customary international law. After careful consideration, the District Court declined to afford evidentiary weight to these affidavits. It determined that the affidavits "are even less probative [than plaintiffs' documentary evidence] of the existence of universal norms, especially considering the vigorous academic debate over the content of international law." Flores, 253 F.Supp.2d at 521. It explained further:
 
 
 117
 The Second Circuit in Filartiga stated that courts should determine whether a rule is well-established and universally recognized by consulting, among other sources, "`the works of jurists, writing professedly on public law.'" Filartiga, 630 F.2d at 880, quoting United States v. Smith, 18 U.S. (5 Wheat.) 153, 160-61, 5 L.Ed. 57 (1820). In this case, plaintiffs and defendant have submitted multiple affidavits by professors, explaining why or why not plaintiffs' claims are supported by customary international law. The affidavits serve essentially as supplemental briefs, providing arguments and citations which for the most part also appear in the parties' main briefs. I doubt that such academic exercises in advocacy are the sort of scholarly writings the Second Circuit had in mind when it identified the sources that could serve as evidence of customary international law.
 
 Id. at 521 n. 17.[42]
 
 118
 Plaintiffs argue on appeal that the District Court did not accord proper weight to the statements of their experts. They maintain that "[t]he authority of scholars, [and] jurists ... has long been recognized by the Supreme Court and this Court as authoritative sources for determining the content of international law." Pls.' Br. at 19 (emphasis added). In support of this assertion, they rely upon the Supreme Court's decision in The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900), as well as Article 38 of the ICJ Statute.
 
 
 119
 In its seminal decision in Paquete Habana, the Supreme Court designated "the works of jurists [i.e., scholars] and commentators" as a possible source of customary international law. Paquete Habana, 175 U.S. at 700, 20 S.Ct. 290. However, the Court expressly stated that such works "are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is." Id. (emphasis added), quoted in Filartiga, 630 F.2d at 881. Accordingly, under Paquete Habana, United States judicial tribunals may only "resort[] to" the works of "jurists and commentators" insofar as such works set forth the current law as it "really is." 175 U.S. at 700, 20 S.Ct. 290 (emphasis added); see also note 26, ante. Conversely, courts may not entertain as evidence of customary international law "speculations" by "jurists and commentators" about "what the law ought to be." Id.
 
 
 120
 Similarly, Article 38 of the ICJ Statute does not recognize the writings of scholars as primary or independent sources of customary international law. Section 1(d) of Article 38 provides in pertinent part that courts may consult "the teachings of the most highly qualified publicists [i.e., scholars or `jurists'] of the various nations, as subsidiary means for the determination of rules of law." ICJ Statute, June 26, 1945, art. 38(1)(d), 59 Stat. 1055, U.S.T.S. 993 (emphasis added). Here, the word "subsidiary" assigns to the works of scholars a distinctly secondary role — to assist in discovering the authoritative principles of law, rather than to create or supplement them. The other three categories of evidence enumerated in Article 38, see Discussion, section II.B.2, ante, constitute primary sources of customary international law, but the works of scholars constitute subsidiary or secondary sources that may only be consulted "for trustworthy evidence" of what customary international law "really is." Paquete Habana, 175 U.S. at 700, 20 S.Ct. 290; see United States v. Yousef, 327 F.3d 56, 102-03 (2d Cir.2003).
 
 
 121
 The acknowledgment in Paquete Habana and Article 38 of the works of scholars as subsidiary or secondary sources of customary international law stems from the fact that, as noted above, the primary evidence of customary international law is widely dispersed and generally unfamiliar to lawyers and judges. See Discussion, section II.B.1, ante. The Supreme Court and the drafters of Article 38 recognized the value of the role traditionally played by scholars in identifying and recording the practices of States and thereby revealing the development of customary international law rules. See note 26, ante. But neither Paquete Habana nor Article 38 recognizes as a source of customary international law the policy-driven or theoretical work of advocates that comprises a substantial amount of contemporary international law scholarship. Nor do these authorities permit us to consider personal viewpoints expressed in the affidavits of international law scholars. In sum, although scholars may provide accurate descriptions of the actual customs and practices and legal obligations of States, only the courts may determine whether these customs and practices give rise to a rule of customary international law.
 
 
 122
 We have reviewed the affidavits submitted by plaintiffs and agree with the District Court's conclusion that they are not competent evidence of customary international law.
 
 
 123
 * * * * * *
 
 
 124
 In addition to the types of evidence discussed above, plaintiffs direct the Court's attention to a varied assortment of other instruments that neither give rise to, nor evidence, concrete, international legal obligations.[43] Plaintiffs argue that all of the items of evidence they have submitted, when taken together, prove that local environmental pollution violates customary international law. However, because each of the instruments and affidavits plaintiffs rely on provides no evidence that intranational pollution violates customary international law, plaintiffs' claims fail whether these instruments and affidavits are considered individually or cumulatively.
 
 
 125
 Because plaintiffs have failed to submit evidence sufficient to establish that intranational pollution violates customary international law, the District Court properly granted defendant's motion to dismiss.
 
 IV. Plaintiffs' Forum Non Conveniens Claims
 
 126
 Plaintiffs also challenge the District Court's determination that their claims should be dismissed pursuant to the doctrine of forum non conveniens. The District Court conducted a careful and thorough analysis of this issue, in which it considered all of the relevant factors. However, in light of our conclusion that plaintiffs failed to state a claim under the ATCA, we need not review this alternative ground for the dismissal.
 
 CONCLUSION
 
 127
 For the reasons stated above, we affirm the judgment of the District Court dismissing plaintiffs' complaint for lack of jurisdiction and failure to state a claim under the ATCA.
 
 
 
 Notes:
 
 
 [1]
 This provision has also been referred to as the "Alien Tort Act,"see, e.g., Kadic v. Karadzic, 70 F.3d 232, 238 (2d Cir.1995), and the "Alien Tort Statute," see, e.g., Filartiga v. Pena-Irala, 630 F.2d 876, 880 (2d Cir.1980).
 
 
 [2]
 In the context of the ATCA, we have consistently used the term "customary international law" as a synonym for the term the "law of nations."See generally Kadic v. Karadzic, 70 F.3d 232, 239 (2d Cir.1995); Filartiga v. Pena-Irala, 630 F.2d 876, 884 (2d Cir.1980). The term "customary international law" echoes the earlier phrase sometimes used to describe the law of nations, "the customary law of nations." See, e.g., The Estrella, 17 U.S. (4 Wheat.) 298, 307-08, 4 L.Ed. 574 (1819) (referring to non-treaty-based law of nations as the "the customary ... law of nations").
 
 
 [3]
 On appeal, plaintiffs only pursue their claims that defendant's conduct violates customary international law rights to life and health; they no longer base their argument on a right to "sustainable development."
 
 
 [4]
 For example, in 1991, SPCC entered into an agreement with the government of Peru that, in conjunction with a modernization and expansion of its facilities, it would spend $135 million for several environmental projects to be overseen by the MEM. The MEM approved the design and spending on these projects, which were completed in 1996
 
 
 [5]
 Record evidence, not contested by plaintiffs, demonstrates that SPCC has been sued in Peru for damages resulting from the environmental impact of its operations
 
 
 [6]
 Section 602(2) of the Restatement (Third) provides:
 Where pollution originating in a state has caused significant injury to persons outside that state, or has created a significant risk of such injury, the state of origin is obligated to accord to the person injured or exposed to such risk access to the same judicial or administrative remedies as are available in similar circumstances to persons within the state.
 
 
 [7]
 No appeal was taken from that decision
 
 
 [8]
 The plaintiff inBeanal also raised claims of genocide and cultural genocide. Id. at 166. We omit discussion of these claims because they are not at issue in the instant case.
 
 
 [9]
 The District Court conditioned its dismissal on the ground offorum non conveniens on the defendant's stipulation to:
 (1) defend [plaintiffs'] claims on the merits in any action plaintiffs may bring in a Peruvian court and
 (2) waive any statute or period of limitations that would otherwise apply under Peruvian law to any action brought by plaintiffs in a Peruvian court within two years after the date of this Court's order of dismissal or the resolution of any and all appeals from that order, whichever occurs later.
 Flores, 253 F.Supp.2d at 544.
 
 
 [10]
 The Judiciary Act of 1789 reads, in relevant part: "[T]he district courts ... shall also have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States." Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 76-77. The ATCA has been amended several times principally to reflect structural and procedural modifications to United States courts
 
 
 [11]
 The Senate debates on the Judiciary Act of 1789 were not recorded and the House debates did not mention the ATCA provisionTel-Oren v. Libyan Arab Republic, 726 F.2d 774, 812 (D.C.Cir.1984) (Bork, J., concurring).
 
 
 [12]
 See Joseph Modeste Sweeney, A Tort Only In Violation of the Law of Nations, 18 Hastings Int'l & Comp. L. Rev. 445, 451 (1995) (arguing that "[t]he word `tort,' . . . referred to wrongs under the law of prize.").
 
 
 [13]
 Indeed, some scholars have suggested that concerns over several attacks on foreign ambassadors in the early United States were the immediate impetus for passage of the ActSee William S. Dodge, The Historical Origins of the Alien Tort Statute: A Response to the "Originalists," 19 Hastings Int'l & Comp. L. Rev. 221, 232-33 (1996); see also William R. Casto, The Federal Courts' Protective Jurisdiction Over Torts Committed in Violation of the Law of Nations, 18 Conn. L. Rev. 467, 495 (1986). The incidents in question are discussed in Respublica v. De Longchamps, 1 U.S. (1 Dall.) 111, 1 L.Ed. 59 (1784), and Report of John Jay, Secretary of Foreign Affairs, on Complaint of Minister of United Netherlands, 34 J. Cont. Cong. 109, 111 (1788). Only certain of the United States at that time provided a remedy for offenses against foreign diplomatic personnel, raising the specter that an offense against foreign diplomatic personnel in a State that did not provide a remedy could leave the United States open to a reprisal. See Letter from Edmund Randolph, Governor of Virginia, to the Honorable Speaker of the House of Delegates (Oct. 10, 1787) (stating that "[i]f the rights of an ambassador be invaded by any citizen it is only in a few States that any laws exist to punish the offender").
 
 
 [14]
 See Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 813 (Bork, J., concurring) ("What kinds of alien tort actions, then, might the Congress of 1789 have meant to bring into federal courts? According to Blackstone, a writer certainly familiar to colonial lawyers, `the principal offences against the law of nations, animadverted on as such by the municipal laws of England, [were] of three kinds; 1. Violation of [the law of prize]; 2. Infringement of the rights of embassadors; and 3. Piracy.'" (internal citation omitted)).
 
 
 [15]
 See Filartiga, 630 F.2d at 881 ("[I]t is clear that courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today."); see also Tel-Oren, 726 F.2d at 789 (Edwards, J., concurring) ("[I]t seems clear beyond cavil that violations of the `law of nations' under section 1350 are not limited to Blackstone's enumerated offenses."); see generally William S. Dodge, The Historical Origins of the Alien Tort Statute: A Response to the "Originalists," 19 Hastings Int'l & Comp. L.Rev. 221 (1996).
 
 
 [16]
 In the German legend, Lohengrin appears as if out of nowhere to rescue a maiden and break a curse, but after her inquiry into his cryptic origins, he vanishes againSee Robert Jaffray, The Two Knights of the Swan: Lohengrin and Helyas, 11 (1910).
 
 
 [17]
 Filartiga did not identify the ATCA as the source of such rights; instead, it stated that "it is sufficient ... to construe the [ATCA] . . . simply as opening the federal courts for adjudication of the rights already recognized by international law." 630 F.2d at 887.
 
 
 [18]
 Customary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War IISee Brigadier General Telford Taylor, U.S.A., Chief of Counsel for War Crimes, Final Report to the Secretary of the Army on the Nuernberg War Crimes Trials Under Control Council Law No. 10, at 109 (William S. Hein & Co., Inc. 1997) (Aug. 15, 1949) ("[T]he major legal significance of the [Nuremberg] ... judgments, lies ... in those portions of the judgments dealing with the area of personal responsibility for international law crimes."); 1 Oppenheim's International Law 505 (Sir Robert Jennings & Sir Arthur Watts eds., 9th ed.1996) (discussing the principle of individual responsibility for war crimes and crimes against humanity); see also Theodor Meron, International Criminalization of Internal Atrocities, 89 Am. J. Int'l L. 554, 572 (1995) (citing Hersch Lauterpacht, The Law of Nations and the Punishment of War Crimes, 2 Brit. Y.B. Int'l L. 58, 65 (1944), as first proposing universal jurisdiction over individual war criminals). For example, the Charter of the International Military Tribunal, which authorized the punishment of the major war criminals of the European Axis, provided that "there shall be individual responsibility" for "war crimes" and for "crimes against humanity." Charter of the International Military Tribunal in Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, 58 Stat. 1544, 82 U.N.T.S. 280, 288.
 
 
 [19]
 Among legal commentators,Filartiga's interpretation of the ATCA has attracted both celebrants and critics. Compare, e.g., Harold Hongju Koh, Transnational Public Law Litigation, 100 Yale L.J. 2347, 2366 (1991) (celebrant), and Anne-Marie Burley, The Alien Tort Statute and the Judiciary Act of 1789: A Badge of Honor, 83 Am. J. Int'l L. 461 (1989) (celebrant), with Curtis A. Bradley & Jack L. Goldsmith, Customary International Law as Federal Common Law: A Critique of the Modern Position, 110 Harv. L. Rev. 815, 833-34 (1997) (critics), and William R. Casto, The Federal Courts' Protective Jurisdiction Over Torts Committed in Violation of the Law of Nations, 18 Conn. L. Rev. 467, 479-80 (1986) (critic).
 
 
 [20]
 By creating a private right of action for victims of official torture, the TVPA "executed" in part the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 1465 U.N.T.S. 85, G.A. Res. 39/46, 39 (1984), 23 I.L.M. 1027, to which the Senate consented on October 27, 1990, S. Treaty Doc. No. 100-20, 136 Cong. Rec. D 1442 (1990)Cf. Cong. Research Serv., Treaties and Other International Agreements: The Role of the United States Senate 87 (1993)("It is the President who negotiates and ultimately ratifies treaties of the United States, but only if the Senate in the intervening period gives its advice and consent."). The United States' obligations under the CAT also are executed in part in the Foreign Affairs Reform and Restructuring Act of 1988 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231), which protects aliens from deportation to a country where they are more likely than not to be tortured. See Wang v. Ashcroft, 320 F.3d 130, 133 (2d Cir.2003). For a discussion of the difference between signing and ratifying a treaty, see Discussion, section III. B.1, post. On the significance of execution of a treaty, see note 34, post.
 
 
 [21]
 The language of the TVPA imposes civil liability on any "individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture ... or ... to extrajudicial killing." TVPA § 2(a). In order to bring a claim under the TVPA, however, a claimant must have "exhausted [any] adequate and available remedies in the place in which the conduct giving rise to the claim occurred."Id. § 2(b); see 28 U.S.C. § 1350 note.
 
 
 [22]
 "Custom is the oldest and the original source of international law as well as of law in general," the substance of which "is to be found in the practice of states." 1Oppenheim's International Law 25-26 (Sir Robert Jennings & Sir Arthur Watts, eds., 9th ed. 1996). The practice of states, in turn, "embraces not only their external conduct with each other, but is also evidenced by such internal matters as their domestic legislation, judicial decisions, diplomatic d[i]spatches, internal government memoranda, and ministerial statements in Parliaments and elsewhere." Id. at 26.
 
 
 [23]
 The principle stated by Judge Friendly inVencap and Judge Kaufman in Filartiga that customary international law addresses only matters of mutual concern among nations, rather than the several domestic concerns of States, finds early support in the Supreme Court's opinion in The Malek Adhel, 43 U.S. (2 How.) 210, 11 L.Ed. 239 (1844). In that case, Justice Story elaborated on why piracy, which he had earlier described as "only a sea term for robbery" in United States v. Smith, 18 U.S. (5 Wheat.) 153, 161-62, 5 L.Ed. 57 (1820) (citation omitted), is proscribed by the law of nations, while robbery is not. He explained: "A pirate is deemed, and properly deemed, hostis bumani generis. But why is he so deemed? Because he commits hostilities upon the subjects and property of any or all nations, without any regard to right or duty, or any pretence of public authority." 43 U.S. (2 How.) at 232 (second emphasis added).
 
 
 [24]
 The International Court of Justice ("ICJ") is a multinational body charged with discerning and applying international law. Under the Charter of the United Nations, "[a]ll Members of the United Nations [including the United States] areipso facto parties to the Statute of the International Court of Justice." Charter of the United Nations, 59 Stat. 1033, 1051, T.S. No. 993 (1945), Art. 93 (effective Oct. 24, 1945).
 The United States Senate consented to the Charter of the United Nations on July 28, 1945, 91 Cong. Rec. 8185, 8190 (1945), causing the United States to be a party to the Statute of the ICJ. The Senate famously conditioned its adoption of President Truman's Declaration that the United states would accede to the compulsory jurisdiction of the ICJ with the Connally Preservation, which permits the United States to opt out of the jurisdiction of the ICJ over a particular dispute if the State determines that the dispute is domestic in nature and that its domestic jurisdiction applies. See Acceptance of Compulsory Jurisdiction of the International Court of Justice, 92 Cong. Rec. 10,694-97 (1946); Dep't State Bull., Sept. 1946, at 452-53. Moreover, although the Charter of the United Nations has been ratified by the United States, it is not self-executing. See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 578 (2d Cir.1993); Filartiga, 630 F.2d at 881-82 & n. 9; Dreyfus v. Von Finck, 534 F.2d 24, 30 (2d Cir.1976); see also Committee of U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 937-38 (D.C.Cir.1988); Frolova v. U.S.S.R., 761 F.2d 370, 374 & n. 5 (7th Cir.1985) (collecting cases). See generally note 34, post (discussing self-executing treaties).
 
 
 [25]
 Article 59 provides in full: "The decision of the Court has no binding force except between the parties and in respect of that particular case."Id. art. 59.
 
 
 [26]
 The ICJ Statute's emphasis on the works of "publicists" — more commonly known as scholars or jurists — as a subsidiary or secondary source of customary international law suffers from an anachronism, as the work of international law scholars during the nineteenth and early twentieth century differed considerably from that of contemporary scholars. In "the nineteenth century positivist heyday of international law," international law scholars "did the hard work of collecting international practices." Remarks of Jack L. Goldsmith, Panel Discussion,Scholars in the Construction and Critique of International Law, 94 Am. Soc'y Int'l L. Proc. 317, 318 (2000). The practice of relying on international law scholars for summaries and evidence of customary international law — that is, as secondary or "subsidiary" sources of international law — makes less sense today because much contemporary international law scholarship is "characterized by normative rather than positive argument, and by idealism and advocacy." Id. at 319.
 The earlier era of scholarly works, consisting in substantial measure of compilations, explications, and digests of primary international legal materials, is exemplified by several series of works descriptive of the international legal practices of the United States, including A Digest of the International Law of the United States (Francis Wharton ed., 1886-87) (three volumes) (a U.S. Government compilation of various official United States documents pertaining to international law), A Digest of International Law (John Bassett Moore ed., 1906) (eight volumes) (same), the Digest of International Law (Green Haywood Hackworth ed., 1940-44) (eight volumes) (same), and the Digest of International Law (Marjorie M. Whiteman ed., 1963-73) (fifteen volumes) (same). See also Annual Digest and Reports of Public International Law Cases (Hersch Lauterpacht et al. ed., 1919-49) (an analogous compilation of British materials published every one to four years); Law Officers' Opinions to the Foreign Office 1793-1860 (Clive Parry ed., 1970-73) (ninety-seven volumes) (similar). Contemporary international law scholarship, largely theoretical and normative, is represented by such works as Steven R. Ratner, Corporations and Human Rights: A Theory of Legal Responsibility, 111 Yale L.J. 443 (2001), and Jack L. Goldsmith and Eric A. Posner, A Theory of Customary International Law, 66 U. Chi. L. Rev. 1113 (1999).
 Without taking any view on the merits of different forms of scholarship, and recognizing the potential of theoretical work to advance scholarship, we note that compilations and digests are of greater value in providing "trustworthy evidence of what the law really is," whereas expressly theoretical or normative works make their contribution by setting forth the "speculations of ... authors concerning what the law ought to be." The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900) (emphases added).
 
 
 [27]
 Plaintiffs raised this argument before the District Court,see Flores, 253 F.Supp.2d at 522, but disavowed it in their appellate brief, see Pls.' Br. at 32-33. As such, the issue is not properly before us, regardless of the fact that they once again raised this issue at oral argument by asserting that, to allege a violation of customary international law, "one must allege intentional and egregious behavior causing long-term, widespread and severe harm." See, e.g., Warren v. Garvin, 219 F.3d 111, 113 n. 2 (2d Cir.2000) (declining to consider an issue addressed only at oral argument because "`[i]ssues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.'" (quoting Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir.1998))). For the sake of bringing clarity to this difficult area of law, however, we consider plaintiffs' argument notwithstanding their waiver of the claim.
 
 
 [28]
 As discussed above, customary international law addresses those matters that are of "mutual" concern to States in their dealings with each other, and not matters that are of "several" concern to each state independentlySee Filartiga, 630 F.2d at 888; Vencap, 519 F.2d at 1015; see also Discussion, section II.B.1, ante.
 
 
 [29]
 Because plaintiffs do not allege that defendants' conduct had an effect outside the borders of Peru, we need not consider the customary international law status of transnational pollutionSee note 6, ante (quoting the provision of the Restatement (Third) addressing transnational pollution).
 
 
 [30]
 Although courts are generally limited to examining the sufficiency of the pleadings on a motion to dismiss, "on a challeng[e] [to] the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings."Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir.1998) (internal quotation marks and citation omitted). While the determination of customary international law is not strictly factual, courts must resort to submissions outside the pleadings in order to ascertain the customs and practices of states. Thus, where a motion to dismiss for lack of subject matter jurisdiction requires a determination of customary international law, courts are not limited to examining the sufficiency of the pleadings.
 
 
 [31]
 Although the ATCA provides a cause of action to aliens for torts "committed in violation of ... a treaty of the United States," 28 U.S.C. § 1350, as well as for violations of the law of nations, plaintiffs do not contend that defendant's actions violate a United States treaty. Instead, they rely on various multilateral treaties, conventions, and covenants as evidence of the "law of nations," or customary international law
 
 
 [32]
 In the United States, ratification occurs when "two thirds of the Senators present concur" in ratifying a signed treaty presented by the Executive. U.S. Const. art. II, § 2, cl. 2. Thus, the United States becomes a "party" to a treaty — that is, becomes contractually bound to obey its terms — only after a treaty has been ratified by the Senate
 
 
 [33]
 As we have previously observed:
 While it is not possible to claim that the practice or policies of any one country, including the United States, has such authority that the contours of customary international law may be determined by reference only to that country, it is highly unlikely that a purported principle of customary international law in direct conflict with the recognized practices and customs of the United States and/or other prominent players in the community of States could be deemed to qualify as a bona fide customary international law principle.
 United States v. Yousef, 327 F.3d 56, 92 n. 25 (2d Cir.2003).
 
 
 [34]
 Self-executing treaties are those that "immediate[ly] creat[e] rights and duties of private individuals which are enforceable and [are] to be enforced by domestic tribunals." Stefan A. Riesenfeld,Comment: The Doctrine of Self-Executing Treaties and U.S. v. Postal: Win at Any Price?, 74 Am. J. Int'l L. 892, 896-97 (1980). Non-self-executing treaties "require implementing action by the political branches of government or ... are otherwise unsuitable for judicial application." Lori Fisler Damrosch, The Role of the United States Senate Concerning "Self-Executing" and "Non-Self-Executing" Treaties, 67 Chi.-Kent L. Rev. 515, 516 (1991); see also Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 252, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984); Wang v. Ashcroft, 320 F.3d 130, 140 (2003); Dreyfus v. Von Finck, 534 F.2d 24, 30 (2d Cir.1976).
 
 
 [35]
 The United States Senate gives its advice and consent to ratification of the ICCPR on April 2, 1992See International Covenant on Civil and Political Rights, 102d Cong., 138 Cong. Rec. S4781, S4784 (ratified June 8, 1992); I United Nations, Multilateral Treaties Deposited with the Secretary General 165 (2003). However, the treaty was ratified with numerous reservations conforming the United States' obligations under the ICCPR to the requirements of the Constitution, and with the declaration that the ICCPR is not self-executing. Id. Accordingly, this treaty does not create a private cause of action in United States courts. Id.; see also S. Exec. Rep. No. 102-23, at 9, 19, 23 (1992), 138 Cong. Rec. S4096; Poindexter v. Nash, 333 F.3d 372, 379 (2d Cir.2003); Romeu v. Cohen, 265 F.3d 118, 136 n. 8 (2d Cir.2001); Al Odah v. United States, 321 F.3d 1134, 1147 (D.C.Cir.2003) (Randolph, J., concurring).
 
 
 [36]
 General Assembly documents cited by plaintiffs in their briefs include the Universal Declaration of Human Rights, G.A. Res. 217A(III), U.N. GAOR, 3d Sess., U.N. Doc. A/810, at 71 (1948) arts. 3 (right to life), 25 (right to health), and the World Charter for Nature, G.A. Res. 37/7, U.N. GAOR, 37th Sess., Supp. No. 51, at 17, U.N. Doc. A/37/51 (1982)
 
 
 [37]
 The pre-eminent authority on the law of international institutions, Professor Sir Derek Bowett of Cambridge University, writing in the late 1950s, made precisely the same point:
 The Assembly is a deliberative body, an organ for discussion in the widest sense. It has, of course, power to investigate facts, to make recommendations, but it has no power to bind the members; it cannot take binding decisions as the Security Council can. This means, then, that any analogy with the legislature of a state is very misleading, for the Assembly's functions cannot be legislative in the true sense. The only way in which its recommendations can become binding upon members is for the members to agree in advance to treat those recommendations as binding, but the Assembly's recommendations themselves have no legally binding force.
 D.W. Bowett, The General Assembly, in The United Nations: The First Ten Years 3, 9-10 (B.A. Wortley ed., 1957); see also D.W. Bowett, The Law of International Institutions 41 (3d ed. 1975) (cautioning that "any attempt to draw analogies with a national assembly, parliament or legislature, is apt to be dangerous" and recognizing that General Assembly resolutions may "become evidence of international law" only "indirectly" and only if they "embody a consensus of opinion about what the law is"); Robert C. Hilderbrand, Dumbarton Oaks: The Origins of the United Nations and the Search for Postwar Security 108-10 (1990) (discussing the role of the General Assembly vis à vis the Security Council); Stephen M. Schwebel, The Effect of Resolutions of the U.N. General Assembly on Customary International Law, 73 Am. Soc'y Int'l L. Proc. 301, 301 (1979) (noting the observation of Secretary of State Cyrus R. Vance that "while the one-state, one-vote procedure for expressing the sense of the General Assembly is from many points of view unsatisfactory, the incorporation of this principle in the Charter was balanced by giving the Assembly only recommendatory powers" (quoting The Secretary's Report to the President on Reform and Restructuring of the U.N. System, Dep't St. Pub. No. 8940 (June 1978))). See generally 8-10 Documents of the United Nations Conference on International Organization, San Francisco, 1945 (United Nations Information Organizations ed., 1945) (collecting documents relating to creation and function of the General Assembly).
 
 
 [38]
 The District of Columbia Circuit has described the Universal Declaration as "merely a non-binding resolution."Haitian Refugee Ctr. v. Gracey, 809 F.2d 794, 816 n. 17 (D.C.Cir.1987). Moreover, at the time of its adoption in 1948, it was the explicit position of the United States that the Declaration "is not a treaty ... [or] an international agreement" and that "[i]t is not and does not purport to be a statement of law or of legal obligation." 19 Dep't State Bull. 751 (1948) (remarks of Eleanor Roosevelt, then a U.S. delegate to the General Assembly). These statements are consistent with Filartiga, which recognized that the Universal Declaration constitutes evidence of customary international law only insofar as States have universally abided by its principles out of a sense of legal obligation and mutual concern.
 
 
 [39]
 Although theFilartiga Court relied in large part on intranational laws and policies, it expressly concluded that official torture is a matter of mutual rather than several concern among States. Filartiga, 630 F.2d at 888-89.
 
 
 [40]
 Even if the General Assembly resolutions cited by plaintiffs,see note 36, ante, did describe the actual customs and practices of states, they would fail for the reasons set forth in Discussion, section III.A, ante — namely, because the proclamations of rights in those resolutions are insufficiently clear and definite to constitute rules of customary international law.
 
 
 [41]
 Even if the Rio Declarationdid create enforceable legal obligations, it would not support plaintiffs' claims. First, as discussed above, the principles set forth in the Rio Declaration are insufficiently definite to constitute rules of customary international law. See Discussion, section III.A, ante. Furthermore, as the District Court correctly noted, Principle 2 of the Declaration may actually undermine plaintiffs' assertion that the Declaration establishes a right to life and a right to health. See Flores, 253 F.Supp.2d at 521. Principle 2 provides:
 States have, in accordance with the Charter of the United Nations and the principles of international law, the sovereign right to exploit their own resources pursuant to their own environmental and developmental policies, and the responsibility to ensure that activities within their jurisdiction or control do not cause damage to the environment of other States or of areas beyond the limits of national jurisdiction.
 Interpreting this text, the District Court correctly observed that the Rio Declaration recognizes the "sovereign right" of nations such as Peru to control the level of environmental exploitation within their borders. Id. at 522; accord Beanal, 197 F.3d at 167 n. 6 ("Although Beanal cites the Rio Declaration to support his claims of environmental torts and abuses under international law, nonetheless, the express language of the declaration appears to cut against Beanal's claims.").
 
 
 [42]
 One of plaintiffs' experts also submitted a substantially similar affidavit inSarei v. Rio Tinto PLC, 221 F.Supp.2d 1116 (C.D.Cal. 2002), appeal pending, Nos. 02-56256, 02-56390 (9th Cir. oral arg. Sept. 8, 2003), a case brought by residents of Papua New Guinea against a mining corporation. The Sarei district court, like the District Court in the instant case, found the affidavit to rely on non-authoritative documents and to espouse a right to life and health too general to be recognized as a rule, norm, or custom of customary international law. Id. at 1156-59.
 
 
 [43]
 Plaintiffs have submitted a 2,248-page, four-volume appendix that consists primarily of documents intended to establish that intranational pollution violates customary international law. In this opinion, we have addressed only those documents that plaintiffs mention in their briefs. We have reviewed the remaining materials that they have submitted and agree with their assessment that those documents are insufficiently relevant or weighty to warrant discussion in the circumstances presented hereSee, e.g. Agreement for the Implementation of the Provisions of the United Nations Convention on the Law of the Sea of 10 December 1995 relating to the Conservation and Management of Straddling Fish Stocks and Highly Migratory Fish Stocks, United Nations Conference on Straddling Fish Stocks and Highly Migratory Fish Stocks, 6th Sess., U.N. Doc. A/CONF.164/37 (1995), 34 I.L.M. 1542; Agreement Establishing the European Bank for Reconstruction and Development, Paris, France, May 29, 1990, 29 I.L.M. 1077; Convention on the Elimination of All Forms of Discrimination Against Women, G.A. Res. 34/180, U.N. GAOR, 34th Sess., Supp. No. 46, at 193, U.N. Doc. A/34/46 (1979), 19 I.L.M. 33 (1980).